JUDGE KAPLAN

'09 CIV 7314

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
DEVAL DENIZCILIK VE TICARET A.S.
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

DEVAL DENIZCILIK VE TICARET A.S.,

Plaintiff,

-against-

SENSY FREIGHT SRL,

Defendant.

---------------------------------------------------------------X

09 Civ.

AUG 19 2009

**VERIFIED COMPLAINT**

Plaintiff, DEVAL DENIZCILIK VE TICARET A.S. ("Plaintiff"), by its attorneys, Brown Gavalas & Fromm LLP, as and for its Verified Complaint against defendant SENSY FREIGHT SRL ("Defendant"), alleges upon information and belief as follows:

1. This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has jurisdiction under 28 U.S.C. § 1333.

2. At all material times, Plaintiff was and now is a corporation duly organized and existing under and by virtue of the laws of the Republic of Turkey, with an office and place of business at F. Kerim Gokay Caddesi, Denizciler Is Merkezi, B-Blok, No. 14, Istanbul, Turkey.

3. Upon information and belief, at all material times Defendant was and still is a foreign corporation organized and existing under and by virtue of the laws of a foreign country, with an office and place of business at Avenida Ana Costa 222, Millennium Tower, Cj 82 CEP

11060-000, Santos, SP, Brazil.

4. At all material times, Plaintiff was the registered owner of the motor vessel BAKU ("the Vessel").

5. On or about July 10, 2009, Plaintiff, as owner, and Defendant, as charterer, entered into an agreement whereby Plaintiff agreed to let and Defendant agreed to hire the Vessel to transport a "full and complete cargo" of rice in bulk up to the capacity of the Vessel's holds in Plaintiff's option, for a single voyage from Rio Grande do Sul, Brazil to Puerto Cabello, Venezuela, at a freight rate of $29.00 per metric ton ("the Charterparty"). A copy of the Charterparty is annexed hereto as Exhibit "A".

6. The Vessel has a grain capacity of 759,474 cubic feet, as provided for in Clause 28 of the Charterparty. The Vessel, therefore, is capable of loading 16,886.20 metric tons at a rate of $29.00 per metric ton of the bulk rice cargo.

7. Plaintiff duly delivered the Vessel to Defendant in accordance with the terms of the Charterparty, and Plaintiff has otherwise fully complied with its obligations under the Charterparty.

8. Despite due demand for performance, Defendant has failed to furnish any cargo to the Vessel and has failed to pay the required freight due under the Charterparty.

9. As a result of Defendant's breach of the Charterparty in failing to provide the minimum cargo required thereunder, Defendant owes Plaintiff freight in the amount of $489,438.80, based on a quantity of 16,877.20 metric tons at $29.00 per metric ton (16,877.20 mt x $29.00 = $489,438.80).

10. Under the terms of the Charterparty, all disputes between the parties are to be decided by arbitration in London, pursuant to English law. Plaintiff intends to commence

arbitration proceedings in London imminently.

11. This action is in aid of said London arbitration proceedings in accordance with 9 U.S.C. § 8. Plaintiff seeks to obtain adequate security to satisfy a potential London arbitration award in Plaintiff's favor.

12. In addition to recovering the principal amount due Plaintiff as stated in Paragraph 9 above, Plaintiff is seeking to secure legal costs and interest that may be awarded to Plaintiff as the prevailing party in the London arbitration proceedings. On the advice of E.G. Arghyrakis & Co., a firm of solicitors in London, legal costs and interest are recoverable in London arbitration. The power of the arbitrators to award costs derives from section 61 of the Arbitration Act 1996 which provides as follows:

> 61 Award of costs
>
> (1) The tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties.
>
> (2) Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs.

The power of the arbitrators to award interest derives from section 49 of the Arbitration Act 1996 which provides as follows:

> 49 Interest
>
> (1) The parties are free to agree on the powers of the tribunal as regards the award of interest.
>
> (2) Unless otherwise agreed by the parties the following provisions apply.
>
> (3) The tribunal may award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case—
>
> (a) on the whole or part of any amount awarded by the tribunal, in respect of any period up to the date of the award;

(b) on the whole or part of any amount claimed in the arbitration and outstanding at the commencement of the arbitral proceedings but paid before the award was made, in respect of any period up to the date of payment.

(4) The tribunal may award simple or compound interest from the date of the award (or any later date) until payment, at such rates and with such rests as it considers meets the justice of the case, on the outstanding amount of any award (including any award of interest under subsection (3) and any award as to costs).

(5) References in this section to an amount awarded by the tribunal include an amount payable in consequence of a declaratory award by the tribunal.

(6) The above provisions do not affect any other power of the tribunal to award interest.

13. Plaintiff expects to recover the following amounts in the London arbitration:

| | | |
|---|---|---|
| a. | On the principal claim | $489,438.80 |
| b. | 2 years of interest at 6.75% per annum, compounded quarterly | $70,111.27 |
| c. | Legal Costs (attorneys' fees, etc.) | $91,605.47[1] |
| | TOTAL | $651,155.54 |

14. Plaintiff has conducted an investigation as set out in the accompanying affidavit of Peter Skoufalos and Plaintiff verily believes that Defendant cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure.

15. Defendant is a trading company that ships commodities and other goods worldwide. In addition, Defendant charters vessels to transport its goods and to comply with obligations incurred by Defendant in sales contracts it enters into with other parties. Consequently, it is believed that Defendant will be making hire and/or freight payments to the

[1] This is based on estimated costs of a single arbitrator at £500.00/ day on the basis of a 5 day hearing, including writing the award; say £2,500.00. Costs of 2 witnesses attending London arbitrations (air fares and hotel accommodation) say £1,500.00 each; i.e. £3,000.00. Lawyer's costs, including submissions, witness statements, disclosure, reporting to clients, say at £265.00 per hour, i.e. £50,000.00. Total: £55,500.00 or $91,605.47, based on a conversion rate of £1 = $1.65055 (See http://www.xe.com/ucc).

owners of vessels chartered by Defendant. Further, Defendant will be receiving dollar-denominated payments for the products Defendant sells. Moreover, Defendant will likely be making dollar-denominated payments in payment of its commercial obligations.

16. It is the well-established custom and practice of the industry, that charter hire or freight paid by charterers for the charter of vessels, is payable in United States Dollars. In addition, bunker fuel for ships, which must often be paid for by the charterer, is customarily quoted and paid for in United States Dollars. Further, agents' invoices for services and disbursements rendered to vessels at local ports are customarily rendered and paid in United States Dollars.

17. Consequently, Defendant is believed to have or will have during the pendency of this action, assets within this District, specifically including cash, funds, freight, hire, accounts, electronic funds transfers and other property, in the hands of garnishees in the District including, but not limited to, Wachovia Bank, American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; and UBS AG, which are believed to be due or owing to the Defendant.

Plaintiff prays:

A. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That because the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order

directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are due and owing to the Defendant, in the amount of $651,155.54, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B, answer the matters alleged;

C. That this action be stayed and this Court retain jurisdiction over this matter through the entry of any judgment or award, and any appeals thereof; and

D. That Plaintiff have such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
August 19, 2009

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
DEVAL DENIZCILIK VE TICARET S.A.

By: ______________________

Peter Skoufalos (PS-0105)
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946

# VERIFICATION

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

PETER SKOUFALOS, being duly sworn, deposes and says:

1. I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas & Fromm LLP, attorneys for Plaintiff.

2. I have read the foregoing Verified Complaint and I believe the contents thereof are true.

3. The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4. The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.

PETER SKOUFALOS

Sworn to before me this
19th day of August 2009

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 2010

# EXHIBIT "A"

JUN-12-2009 05:07A DE:AMERICANA SHIPPING G 00541152582544 A:000902166510128 P:1

| | |
|---|---|
| 1. Shipbroker<br>LEVENT SHIPPING AND TRADING CO - ISTANBUL<br>PH : 90 216 651 0126/27 FX : 90 216 651 0128 levent@leventshipping.com | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON", Part 1 |
| | 2. Place and date<br>Istanbul 10.07.2009 |
| 3. Owners/Place of business (Cl. 1)<br>Messrs. Deval Denizcilik ve Tic a.s. | 4. Charterers/Place of business (Cl. 1)<br>Messrs. SENSY FREIGHT SRL.<br>Av. Ana Costa 222, Millennium Tower, Cj 82 CEP 11060-000<br>Santos, SP (5513) 7808-3769 Ctct Mr Guillermo Harrington |
| 5. Vessel's name (Cl. 1)<br>Mv Baku | 6. GRT/NRT (Cl. 1)<br>12930/6769 |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)<br>18,845 on 10,05 m sswd | 9. Present position (Cl. 1)<br>Trading |
| 8. Expected ready to load (abt.) (Cl. 1)<br>22nd July 2009 | |
| 10. Loading port or place (Cl. 1)<br>Rio Grande do sul 1 gsbp aaaa | 11. Discharging port or place (Cl. 1)<br>Puerto Cabello 1 gsbp aaaa |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>Upto full and complete cargo capacity of the vsl's holds in owners option rice in bulk max stowing factor 45' onboard | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>Usd 29,- pmt FIOT bss Free d/a at loading port | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br>Freight payable w/i 2 banking days after signing Bills of Lading marked "fiot" and "frt pyable as per cp dtd." |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | (a) Laytime for loading<br>5,000 mts per working day of 24 consec hrs wp Sundays holidays including |
| 18. Agents (loading) (Cl. 6)<br>To be nominated by the charterers | (b) Laytime for discharging<br>7,000 mts per working day of 24 consec hrs wp Sundays holidays excluded time between Sat 12:00/mon 08:00 hrs not to count unless used, if used actual working time used to count |
| 19. Agents (discharging) (Cl. 6)<br>To be nominated by the owners | (c) Total laytime for loading and discharging<br>——— |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>Usd 13,000 pdpr/fd bends | 21. Cancelling date (Cl. 9)<br>27th July 2009 |
| | 22. General Average to be adjusted at (Cl. 12)<br>London |
| 23. Freight Tax (state if for Owners' account (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15)<br>2,50 % to Americana shipping group srl for division |
| 25. Law and Arbitration (state 19(a), 19(b) or 19(c) of Cl. 19; if 19(c) agreed also state Place of Arbitration) (if not filled in 19(a) shall apply) (Cl. 19)<br>In London as per English law to apply | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19)<br>——— | 26. Additional clauses covering special provisions, if agreed<br>Clauses 20 to 28 (both included) as attached hereto are fully incorporated in this cp |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| DEVAL DENIZCILIK ve TICARET ANONIM ŞIRKETI | GUILLERMO HARRINGTON<br>SENSY FREIGHT SRL |

# PART II

## "Gencon" Charter (As Revised 1922, 1976 and 1994)

**1.** It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:

The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) ~~or place(s)~~ stated in Box 10 ~~or so near thereto as she may safely get and lie always afloat~~, and there load a full and complete cargo ~~(if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility)~~ as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) ~~or places~~ stated in Box 11 as ordered on signing Bills of Lading ~~or so near thereto as she may safely get and lie always afloat~~, and there deliver the cargo.

**2. Owners' Responsibility Clause**

The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.

And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

**3. Deviation Clause**

The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

**4. Payment of Freight**

(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.

~~(b) [illegible]~~

~~(c) [illegible]~~

~~[illegible]~~

**5. Loading/Discharging**

**(a) Costs/Risks**

The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. ~~[illegible]~~

**(b) Cargo Handling Gear**

Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.

~~[illegible]~~

**(c) Stevedore Damage**

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.

The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

**6. Laytime**

*(a) *Separate laytime for loading and discharging*

The cargo shall be loaded ~~within the number of running days/hours~~ as indicated in Box 16, ~~weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

The cargo shall be discharged ~~within the number of running days/hours~~ as indicated in Box 16, ~~weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

*(b) *Total laytime for loading and discharging*

~~[illegible]~~

*(c) *Commencement of laytime (loading and discharging)*

Laytime for loading and discharging shall commence at 14.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given ~~during office hours~~ after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.

If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.

~~If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.~~

Time used before commencement of laytime shall count full at load – Half at discharging port

* *Indicate alternative (a) or (b) as agreed, in Box 16.*

**7. Demurrage**

Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.

In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

**8. Lien Clause**

The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

**9. Cancelling Clause**

~~(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.~~

(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

Such option must be declared by the Charterers within 24 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.

~~The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.~~

**10. Bills of Lading** Charterers'

Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the ~~Owners'~~ agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

**11. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners.

The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12. General Average and New Jason Clause**

General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

**13. Taxes and Dues** Charterers'

(a) On Vessel - The ~~Owners~~ shall pay all dues, charges and taxes customarily levied on the Vessel/flag, howsoever the amount thereof may be assessed.

(b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight shall be paid for the Charterers' account.

DEVAL DENİZCİLİK ve TİCARET ANONİM



## PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

**14. Agency**

In every case the Owners shall appoint ~~their own~~ Charterers' Agent at the port of loading and the port of discharge to be nominated by the owners.

**15. Brokerage**

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.

~~[illegible]~~

**16. General Strike Clause**

~~(a) [illegible]~~

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

Loading

~~(c) [illegible]~~

**17. War Risks ("Voywar 1993")**

(1) For the purpose of this Clause, the words:

(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and / or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and / or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo [illegible]

(4) [illegible]

same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**18. General Ice Clause**

*Port of loading*

(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.

*Port of discharge*

(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.

(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**19. Law and Arbitration**

* (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.

~~[illegible]~~

* ~~(b) [illegible]~~

~~[illegible]~~

* ~~(c) [illegible]~~

(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.

* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.

** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.

DEVAL DENİZCİLİK ve TİCARET ANONİM ŞİRKETİ



**10TH July 2009**

**Clause 20** – The Bsl to be marked "Said to be/Said to weigh"

**Clause 21** – Vessel to supply lights as onboard day and night, if required, free of any expenses to the Charterers.

**Clause 22** – Opening and closing of Hatches to be performed by the vessel's crew, if permitted by shore regulations. Time used for, not to count as lay time.

**Clause 23** – Overtime to be for the account of party ordering same, however, Officers and Crews overtime always to be for Owners account.

**Clause 24** – Vessel to give on fixing 48, 24 and 12 hours definite notice of vessels arrival at the loading and discharging port agents and Charterers.

**Clause 25** – BIMCO ISPS clause + New both to blame collusion clause + General average + New Jason Clause + General Paramount Clause + Hauge/Hauge Visby Rules are deemed to be incorporated in this Charter party

**Clause 26** – This Charter Party to be kept strictly confidential.

**Clause 27** – Bimco ISPS cls to apply

**Clause 28** - Vessels description:

- MV 'BARU'

---------BUILT 2001 – MULTI PURPOSE - SID - GENERAL CARGO CARRIER A1 ICE CLASS C – CALL SIGN : TCCD 5 – GRT/NRT 12930/6769 SUMMER DWT 18.845 ON 10,05M DRAFT – TURKISH FLAG – P+I UK(BERMUDA) – ABS CLASS– L.O.A/BEAM/DEPTH M 165,5/23.05M/13.40M – STEELFOORED – CO2 FITTED – ELECTRO HYDROLIC FOLDING TYPE HATCH COVERS– ALL AFT DECK CRANES 4 X 25 MTS (HEAVY LIFT 50 MTS BSS TWIN FOR HO NO 2/3 ONLY) SUEZ GRT/NRT 16497,03/13523,91 – BOW TRUSTER FITTED
4 X HOLDS/7 X HATCHES DIMS : (ELECTRICAL VENTILATION)
AT EACH HATCH COAMING THERE IS A LONGITUDINAL BEAM DIVIDING THE HATCHES IN THE MIDDLE EXCEPT HATCH COAMING NO 1.

| HO.NO. | LENGHT | GRAIN BALE | HATCH SIZES |
|---|---|---|---|
| – 1 | 18.00 M – | 115.205/102.068 – | 13.00 X 11.80 M |
| – 2 | 31.00 M – | 243.410/238.757 – | 25.60 X 7.80 M (EACH) |
| – 3 | 28.00 M – | 230.504/225.721 – | 25.60 X 7.80 M (EACH) |
| – 4 | 21.00 M – | 170.355/167.217 – | 19.20 X 7.80 M (EACH) |
| TOTAL GR/BL | | 759.474/733.764 CBFT | |

The Charterers

GUILLERMO HARRINGTON

The Owners

DEVAL DENIZCILIK ve TICARET